JOYCE BERGESON *v.* CITY OF NEW LONDON ET AL.
(SC 17005)

Borden, Norcott, Katz, Vertefeuille and Zarella, Js.

---

[21] See footnote 4 of this opinion.

764

Argued March 8—officially released June 22, 2004

*Erik S. Bartlett*, for the appellants (named defendant et al.).

*Nathan Julian Shafner*, for the appellee (plaintiff).

*Yinxia Long*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *William J. McCullough* and *Michael Belzer*, assistant attorneys general, for the appellee (defendant second injury fund).

*Frank A. May* and *Marie Gallo-Hall* filed a brief for the city of Bridgeport as amicus curiae.

*Opinion*

KATZ, J. This appeal requires us to determine whether, pursuant to General Statutes § 31-306 (a) (2) (A)[1] of the Workers' Compensation Act, the second

[1] General Statutes § 31-306 (a) (2) (A) provides in relevant part: "The weekly compensation rate of each dependent entitled to receive compensation under this section as a result of death arising from a compensable injury occurring on or after October 1, 1977, shall be adjusted annually as provided in this subdivision as of the following October first, and each subsequent October first, to provide the dependent with a cost-of-living adjustment in the dependent's weekly compensation rate as determined as of the date of the injury under section 31-309. . . . The cost-of-living increases provided under this subdivision shall be paid by the employer without any order or award from the commissioner. . . . The employer or

injury fund (fund)[2] is required to reimburse a municipal employer for cost-of-living adjustments (COLAs) paid in connection with a claim for benefits under the Heart and Hypertension Act, General Statutes § 7-433c.[3] The defendants, the city of New London (city) and CIRMA Claims and Risk Control Services (CIRMA),[4]

its insurer shall be reimbursed by the Second Injury Fund, as provided in section 31-354, for adjustments, including lump-sum payments, payable under this subparagraph for deaths from compensable injuries occurring on or after July 1, 1993, and before October 1, 1997, upon presentation of any vouchers and information that the Treasurer shall require."

[2] The fund was not a party in the initial administrative proceedings. The plaintiff, Joyce Bergeson, sought survivor's benefits from the named defendant, the city of New London (city), and the defendant insurer, CIRMA Claims and Risk Control Services (CIRMA). After the plaintiff was awarded benefits by the workers' compensation commissioner for the second district, the city and CIRMA, in turn, sought reimbursement from the fund for certain payments. In this appeal, the city and CIRMA are the appellants, and the fund and the plaintiff are the appellees.

[3] General Statutes § 7-433c (a) provides in relevant part: "Notwithstanding any provision of chapter 568 [the Workers' Compensation Act] or any other general statute, charter, special act or ordinance to the contrary, in the event a uniformed member of a paid municipal fire department or a regular member of a paid municipal police department who successfully passed a physical examination on entry into such service, which examination failed to reveal any evidence of hypertension or heart disease, suffers either off duty or on duty any condition or impairment of health caused by hypertension or heart disease resulting in his death or his temporary or permanent, total or partial disability, he or his dependents, as the case may be, shall receive from his municipal employer compensation and medical care in the same amount and the same manner as that provided under chapter 568 if such death or disability was caused by a personal injury which arose out of and in the course of his employment and was suffered in the line of duty and within the scope of his employment . . . . The benefits provided by this section shall be in lieu of any other benefits which such policeman or fireman or his dependents may be entitled to receive from his municipal employer under the provisions of chapter 568 or the municipal or state retirement system under which he is covered, except as provided by this section, as a result of any condition or impairment of health caused by hypertension or heart disease resulting in his death or his temporary or permanent, total or partial disability. . . ."

[4] The city and CIRMA jointly submitted a brief to this court, and both are represented by the same counsel. Accordingly, for purposes of this opinion, we shall refer to them jointly as the "city."

appeal[5] from the decision of the workers' compensation review board (board) concluding that the fund was not required to reimburse the city for COLAs paid to the plaintiff, Joyce Bergeson, in connection with her claim arising under § 7-433c. Specifically, the city claims that the board improperly concluded that §§ 7-433c and 31-306 (a) (2) (A) do not require the fund to reimburse the city. The city further contends, in the alternative, that §§ 7-433c and 31-306 (a) (2) (A) violate the federal and state constitutions because they deprive municipal employers of a protected property interest without due process of law. We reject the city's claims and, accordingly, we affirm the decision of the board.

The record reveals the following undisputed facts and procedural history. The plaintiff's husband, Axel Bergeson, while employed as a police officer by the city, suffered a fatal heart attack on June 17, 1995. On November 9, 1995, the plaintiff was awarded survivor's benefits under § 7-433c by the workers' compensation commissioner for the second district (commissioner). Since that time, the city has paid the plaintiff's benefits, including COLAs pursuant to § 31-306 (a) (2) (A), on a without-prejudice basis. On February 6, 2002, the commissioner ordered the fund to reimburse the city for the COLA payments. Specifically, the commissioner concluded that the plain language of § 31-306 (a) (2) (A) "is clear that the [f]und shall reimburse the [city] for any [COLAs] paid as a result of deaths occurring between July 1, 1993 and October 1, 1997."

The fund subsequently appealed to the board, which reversed the decision of the commissioner. Specifically, the board concluded that benefits under § 7-433c are not benefits under the Workers' Compensation Act and,

---

[5] The city and CIRMA appealed to the Appellate Court and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

therefore, are not subject to the reimbursement provision of § 31-306 (a) (2) (A). In so concluding, the board relied on *McNulty* v. *Stamford*, 37 Conn. App. 835, 845, 657 A.2d 1126 (1995), in which the Appellate Court concluded that an earlier revision of § 31-306 (a) (2) (A) did not require the fund to reimburse municipal employers for COLAs paid in connection with § 7-433c benefits. This appeal followed.

I

The city first claims that, under § 31-306 (a) (2) (A), it is entitled to reimbursement from the fund for COLA payments made in connection with a claim for benefits under § 7-433c. The fund claims, in response, that it is not required to reimburse municipal employers for COLAs paid in connection with § 7-433c benefits, which are intended as a "special bonus" to paid police officers and firefighters and, accordingly, are not workers' compensation benefits for the purposes of the reimbursement provision in § 31-306 (a) (2) (A). We agree with the fund.

We note, at the outset, that our resolution of this issue revolves around the interrelationship of the Workers' Compensation Act,[6] which is codified in chapter 568 of title 31 of the General Statutes, and § 7-433c, which commonly is known as the Heart and Hypertension Act. Therefore, we begin our analysis with a brief overview of that statutory framework. "The Workers' Compensation Act was enacted to provide compensation for any injury arising out of and in the course of employment, without regard to fault, by imposing a form of strict liability on the employer. . . . Heart disease and hypertension are just some of the many ailments compensable under the act. . . . In order to recover under chapter 568, however, [t]he employee has the burden of proving that the injury claimed arose out of the

---

[6] General Statutes § 31-275 et seq.

employment and occurred in the course of the employ-ment. . . . Section 7-433c, on the other hand, was enacted to provide *special compensation* to qualifying [police officers] and fire[fighters] who die or become disabled as a result of hypertension or heart disease. . . . It requires the employer to pay compensation to those officers who have successfully passed a physical examination which failed to reveal any evidence of hypertension or heart disease and who subsequently die or are disabled as a result of such conditions whether or not the disease resulted from the employee's occupa-tion or . . . occurred in the line and scope of his employment. . . . An employee may, if the facts so warrant, elect to proceed under either chapter 568 or § 7-433c." (Citations omitted; emphasis added; internal quotation marks omitted.) *Collins* v. *West Haven,* 210 Conn. 423, 425–27, 555 A.2d 981 (1989).

"As a threshold matter, we set forth the standard of review applicable to workers' compensation appeals. . . . It is well established that [a]lthough not disposi-tive, we accord great weight to the construction given to the workers' compensation statutes by the commis-sioner and [the] board. . . . A state agency is not enti-tled, however, to special deference when its determination of a question of law has not previously been subject to judicial scrutiny. . . . Whe[n] . . . [a workers' compensation] appeal involves an issue of statutory construction that has not yet been subjected to judicial scrutiny, this court has plenary power to review the administrative decision." (Internal quotation marks omitted.) *Kuehl* v. *Z-Loda Systems Engineering, Inc.,* 265 Conn. 525, 532, 829 A.2d 818 (2003). Because this appeal raises an issue of statutory construction that is of first impression for this court, our review is plenary.

We begin with our well established principles of statu-tory interpretation in analyzing the city's claim. Our

legislature recently has enacted No. 03-154, § 1, of the 2003 Public Acts, which provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." In the present case, the relevant statutory text and the relationship of that text to other statutes do not reveal a meaning that is plain and unambiguous. Accordingly, our analysis is not limited and we look to other factors relevant to the inquiry into the meaning of § 31-306 (a) (2) (A), including its legislative history and the circumstances surrounding its enactment and its purpose.

Of particular relevance in the present case is the principle that "[p]ayment of an award from a special fund such as the second injury . . . fund, which was established, inter alia, to assist in the payment of compensation awarded to handicapped and disadvantaged workers . . . should be made only in accordance with express statutory authority . . . in order to protect that special fund and prevent unwarranted diversions of it from the specific purpose for which it was created." (Citations omitted; internal quotation marks omitted.) *Civardi* v. *Norwich*, 231 Conn. 287, 294, 649 A.2d 523 (1994); see also *Badolato* v. *New Britain*, 250 Conn. 753, 762, 738 A.2d 618 (1999). With these principles in mind, we turn to the merits of the city's claim.

As with any issue of statutory construction, we begin with the pertinent statutory language. Section 31-306 (a) (2) (A) provides in relevant part: "The employer or its insurer shall be reimbursed by the Second Injury Fund, as provided in section 31-354, for adjustments, including lump-sum payments, *payable under this subparagraph for deaths from compensable injuries*

occurring on or after July 1, 1993, and before October 1, 1997, upon presentation of any vouchers and information that the Treasurer shall require." (Emphasis added.)

We previously have stated that "benefits awarded to an employee pursuant to § 7-433c are *payable . . . under the Work[ers'] Compensation Act . . . .*" (Emphasis in original; internal quotation marks omitted.) *King* v. *Sultar*, 253 Conn. 429, 439, 754 A.2d 782 (2000); see *Carriero* v. *Naugatuck*, 243 Conn. 747, 759, 707 A.2d 706 (1998). This observation does not end our inquiry, however, because the Workers' Compensation Act expressly authorizes reimbursement from the fund for COLAs that are "payable . . . for deaths from *compensable injuries . . . .*" (Emphasis added.) General Statutes § 31-306 (a) (2) (A). Accordingly, before we can apply § 31-306 (a) (2) (A) as written, we must determine what is meant by the phrase "compensable injuries."

General Statutes § 31-275 (4), which defines the term "compensation" for purposes of the Workers' Compensation Act, provides in relevant part: " 'Compensation' means benefits or payments *mandated by the provisions of this chapter . . . .*" (Emphasis added.) The term "injury" is defined by § 31-275 (16) (A), which provides: " 'Personal injury' or 'injury' includes, in addition to accidental injury which may be definitely located as to the time when and the place where the accident occurred, an injury to an employee which is causally connected with his employment and is the direct result of repetitive trauma or repetitive acts incident to such employment, and occupational disease." Therefore, it is apparent that the term "compensable injuries," as used in § 31-306 (a) (2) (A), would apply only to injuries that are causally related to the employee's job, and to occupational disease. As we previously have stated, however, the benefits paid by a municipal employer pursuant to § 7-433c are not "benefits required by a

'work[ers'] compensation law' or 'occupational disease law' of this state." *Plainville* v. *Travelers Indemnity Co.*, 178 Conn. 664, 673, 425 A.2d 131 (1979). Although an award of benefits under § 7-433c *"is* a work[ers'] compensation award in the sense that its benefits are payable and procedurally administered under the Work-[ers'] Compensation Act . . . [it] is *not* a work[ers'] compensation award because it requires no proof of eligibility or liability under the Work[ers'] Compensation Act." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Carriero* v. *Naugatuck*, supra, 243 Conn. 759–60, quoting *Middletown* v. *Local 1073*, 1 Conn. App. 58, 65–66, 467 A.2d 1258 (1983), cert. dismissed, 192 Conn. 803, 471 A.2d 244 (1984).

We next turn to other factors relevant to our inquiry into the meaning of § 31-306 (a) (2) (A), including the legislative history of the statute, the circumstances surrounding its enactment and its purpose. Until 1993, the dependents of deceased employees were entitled to COLAs for deaths arising from compensable injuries sustained on or after October 1, 1977. See General Statutes (Rev. to 1993) § 31-306 (a) (2) (A). Effective July 1, 1993, the legislature amended the statute to eliminate COLAs for dependents of deceased employees injured on or after that date. Public Acts 1993, No. 93-228, §§ 15, 32. Thereafter, the legislature reversed course, effective October 1, 1997, amending § 31-306 (a) (2) (A) to reinstate COLAs for dependents of deceased employees injured on or after July 1, 1993, and before October 1, 1997. See Public Acts 1997, No. 97-205, §§ 3, 6; see also Substitute Senate Bill No. 976, 1997 Sess., § 3 (entitled in part "An Act Restoring Workers' Compensation Cost-of-Living Adjustments for Widows, Widowers, Orphans and Totally Disabled Workers"). In addition, the legislature amended § 31-306 (a) (2) (A) to provide that employers and insurers are entitled to reimbursement from the fund for COLAs paid for deaths from injuries

occurring on or after July 1, 1993, and before October 1, 1997. See Public Act 97-205, § 3.

The circumstances surrounding the 1997 amendments to the Workers' Compensation Act were reviewed extensively in *Hasselt* v. *Lufthansa German Airlines*, 262 Conn. 416, 815 A.2d 94 (2003), in which we stated: "The bill reinstating COLAs effective October 1, 1997, as initially raised in the labor and public employees committee, differed in several respects from the bill ultimately enacted. See Raised Bill No. 6627, 1997 Sess., § 2. The raised bill contained no requirement that the employee receive a retroactive lump sum payment for COLAs accrued prior to October 1, 1997. See id. It did provide, however, that [t]he cost of the adjustments shall be paid by the employer or his insurance carrier who shall be reimbursed therefor from the [fund] . . . . Id., § 2 (b). At the committee hearings, Robert Kehmna, president of the Insurance Association of Connecticut, testified as to concerns that the bill as drafted would impose a liability on insurance carriers for which they had not contracted. Conn. Joint Standing Committee Hearings, Labor and Public Employees, Pt. 1, 1997 Sess., pp. 58–65. Kehmna explained that the insurance carriers had negotiated and collected premiums based on their statutory obligations as of the year of injury, and that they could not renegotiate contracts for pre-1997 injuries to account for COLAs payable perhaps ten or twenty years into the future, which were not mandated during the 1993–1997 period.[7] Id., pp. 61–62. In response to

---

[7] During his testimony at the committee hearings, Kehmna stated, when addressing the change from the insurance carriers' pre-1997 legal obligations, in which they had no liability for 1993–1997 COLAs: "We cannot collect a premium for a COLA that does not exist, but the basis of how we calculate premiums and how the Insurance Department approves what we charge, this is a prior approval line of business. We cannot reach back and correct a mistake that we made. If we make a bad guess as to what our exposure is in 1997, in 1998 we can't reach back and say, 'Hey, we want to make up for our mess up there.' No. Sorry. It's done. You collect the premiums in 1997 for the accidents that occur in that year regardless of when they are actually paid out.

Kehmna's testimony, several committee members indicated that they would take the insurance carriers' concerns into account.[8] See id., pp. 62, 65, remarks of Senator Edith G. Prague and Representative Christopher G. Donovan.

"The bill, as subsequently amended and introduced to the legislature, required employers to pay employees a retroactive lump-sum payment upon qualification for COLAs and required the fund to reimburse employers or insurers for adjustments, including lump-sum payments . . . . See Substitute Senate Bill No. 976, 1997 Sess., § [3]. The analysis of the amended bill by the office of legislative research explained in relevant part that Senate Amendment A, which became part of the bill requires lump sum payments for retroactive COLAs for . . . totally and permanently disabled workers injured

"So for example, if you have a benefit that's paid out over a ten year period or a twenty year period, for an accident that occurred in 1997, you collected [a] premium in that year to cover those costs. I cannot, my members cannot, if you pass a COLA bill that applies to '93 to '97, cannot go back in 1998 and say, 'I need to collect more dollars for the '93 to '97–98 period.' That's not how the rating mechanism works.

"I would refer you to, I believe, [General Statutes §§] 31-306 and 31-307a which show in 1977 and 1969, when this type of similar benefit was created, there was a way, the state came up with a way to reimburse the insurer or employer for that new COLA because they had reached back and created something retroactively." Conn. Joint Standing Committee Hearings, supra, pp. 61–62.

[8] During the committee hearings, the following exchange occurred between Kehmna, Representative Christopher G. Donovan and Senator Edith G. Prague regarding the issue of insurance carriers' liability for COLAs:

"[Kehmna]: I would encourage you to look at lists, or examples which are replete through the Workers' Compensation Act. The Legislature in its wisdom as a matter of social policy has created a benefit and given it retroactive application. The Legislature did not ask the insurance community or the employer community to pay for something that was not [in existence] when they reached back. It's a simple matter of fairness.

"[Representative Donovan]: I'm sure we can work out a plan to deal with that.

"[Senator Prague]: Fairness. It's a good word. That's a very good word." Conn. Joint Standing Committee Hearings, supra, p. 65.

between July 1, 1993 and September 30, 1997; [and] . . . requires the [fund] to reimburse employers and insurers for the retroactive adjustments *as well as for future COLAs for eligible claimants injured between those dates* . . . . Office of Legislative Research Amended Bill Analysis, p. 199; see also id., p. 198.

"In debates on the amended bill in the House of Representatives, legislators stated that the fiscal impact of the bill primarily would affect the fund, not the insurance carriers. See 40 H.R. Proc., Pt. 14, 1997 Sess., p. 5180, remarks of Representative Donovan; id., pp. 5196–97, remarks of Representative James A. O'Rourke III.[9] Representative Dominic Mazzoccoli asked for clarification on the bill, stating that he was under the impression that the legislature was in the process of phasing out the . . . fund. Id., p. 5187. Representative Donovan explained: I guess by law we are phasing it out by not taking new cases. There are still a number of individuals who are on the . . . fund and we continue the liability of those individuals. Id., pp. 5187–88.

"Representative O'Rourke subsequently addressed the concern about the fiscal impact on the fund, stating: [A]s far as the impact which has been raised on the . . . fund, it is extremely important that we take this step today. Because every year that we wait to restor[e] [COLAs], that means more and more workers will ultimately have their COLAs paid by the . . . fund. And two years ago we took the step in this chamber to close [the] fund to future liabilities. Id., p. 5197." (Emphasis in original; internal quotation marks omitted.) *Hasselt* v. *Lufthansa German Airlines*, supra, 262 Conn. 427–30.

---

[9] Addressing the fiscal impact of the amended bill, Representative Donovan stated: "Yes Mr. Speaker there is a fiscal impact. The main impact is to the . . . fund." 40 H.R. Proc., supra, p. 5180. He further noted a potential impact on municipalities. Id., pp. 5181–82. Representative O'Rourke added: "For those of you who are worried, the impact is extremely low on workers' comp[ensation] benefits—workers' comp[ensation] insurance rates— excuse me." Id., p. 5196.

Our review of this legislative history reveals that the legislature, in amending § 31-306 (a) (2) (A), intended that the primary economic impact of that provision would be on the fund, and not on employers or their insurers. It also is apparent, however, that the legislature was concerned with keeping the impact on the fund to a minimum. Therefore, because the legislative history of § 31-306 (a) (2) (A) contains no reference to § 7-433c, we now address that provision in our effort to determine whether it falls within the class of benefits that the legislature had intended to be paid for by the fund.

Section 7-433c (a) provides in relevant part: "Notwithstanding any provision of chapter 568 or any other general statute, charter, special act or ordinance to the contrary, in the event a uniformed member of a paid municipal fire department or a regular member of a paid municipal police department who successfully passed a physical examination on entry into such service, which examination failed to reveal any evidence of hypertension or heart disease, suffers either off duty or on duty any condition or impairment of health caused by hypertension or heart disease resulting in his death or his temporary or permanent, total or partial disability, he or his dependents, as the case may be, shall receive from his municipal employer compensation and medical care in the same amount and the same manner as that provided under chapter 568 if such death or disability was caused by a personal injury which arose out of and in the course of his employment and was suffered in the line of duty and within the scope of his employment . . . . The benefits provided by this section shall be in lieu of any other benefits which such policeman or fireman or his dependents may be entitled to receive from his municipal employer under the provisions of chapter 568 . . . ."

The circumstances surrounding the enactment of § 7-433c are well known.[10] See *King* v. *Sultar*, supra, 253 Conn. 440–41. This court previously has stated that § 7-

[10] "Connecticut statutes concerning compensation for policemen and firemen who die or are disabled as a result of hypertension or heart disease have had a rather tumultuous history. In 1951, the General Assembly enacted a statute providing that any impairment of health caused by hypertension or heart disease resulting in the total or partial disability of a uniformed member of a paid municipal fire department who successfully passed a physical examination on entry into such service shall be presumed to have been suffered in the line of duty. [General Statutes (Sup. 1951)] § 175b. The rebuttable presumption afforded to firemen was, in 1953, made applicable to regular members of paid, municipal police departments; [General Statutes (Sup. 1953)] § 308c; and, in 1955, was applied to situations where death, as well as disability, results. [General Statutes (Sup. 1955)] § 407d.

"This provision, which was repealed and reenacted in 1961 as General Statutes § 7-433a; Public Acts 1961, No. 330, §§ 1, 2; was amended by the legislature in 1967 making it explicit that the statute applies whether the condition occurs while the policeman or fireman is on duty or off duty at the time. Public Acts 1967, No. 770, § 1. Apparently still dissatisfied with the restrictive implementation of those provisions, the General Assembly, in 1969, again amended the statute by making the state retirement system applicable to this section and by substituting a conclusive presumption that the hypertension or heart disease arose out of and in the course of the employee's employment in lieu of the simple presumption. Public Acts 1969, No. 380, § 1.

"In *Ducharme* v. *Putnam*, 161 Conn. 135, 285 A.2d 318 [1971], however, this court held . . . that the conclusive presumption prescribed . . . in the adjudication of work[ers'] compensation cases was in contravention of the due process clauses of both the state and federal constitutions since it operated to completely bar an employer from attempting to prove the negative fact that in a contested case a heart ailment was not causally connected with the employment. [Id., 143]. In obvious response to the suggestion in *Ducharme* that the objective of this legislation might be constitutionally attained by legislation requiring municipalities to provide special compensation or a bonus for policemen and firemen or supplemental or special risk insurance in the case of such occupations; id., 144; the General Assembly thereafter enacted § 7-433c . . . . Upon a subsequent constitutional challenge, the validity of § 7-433c was sustained in 1975 in *Grover* v. *Manchester*, 168 Conn. 84, 357 A.2d 922, appeal dismissed, 423 U.S. 805, 96 S. Ct. 14, 46 L. Ed. 2d 26 [1975]. In *Grover*, we concluded that this statute, which simply [provides] special compensation, or even an outright bonus, to qualifying policemen and firemen, serves a proper public purpose and does not create a class preference which contravenes § 1 of article first of the Connecticut constitution. Id., 88–89 . . . ." (Citations omitted; internal quotation marks omitted.) *Plainville* v. *Travelers Indemnity Co.*, supra, 178 Conn. 667–69; see also *King* v. *Sultar*, supra, 253 Conn. 440–41.

433c "simply [provides] special compensation, or even an outright bonus, to qualifying [police officers] and fire[fighters], [and] serves a proper public purpose . . . ." (Internal quotation marks omitted.) *Plainville* v. *Travelers Indemnity Co.*, supra, 178 Conn. 668–69. "[T]he outright bonus provided by the statute is that the claimant is not required to prove that the heart disease is causally connected to this employment, which he would ordinarily have to establish in order to receive benefits pursuant to the Workers' Compensation Act. . . . Thus, although [the Workers' Compensation Act] is used . . . as a *procedural avenue* for administration of the benefits under § 7-433c . . . an award under § 7-433c is not a workers' compensation award." (Citations omitted; emphasis added; internal quotation marks omitted.) *Carriero* v. *Naugatuck*, supra, 243 Conn. 754–55. Therefore, although this court has recognized that the type and amount of benefits available pursuant to § 7-433c are the same as those under the Workers' Compensation Act; see, e.g., *Felia* v. *Westport*, 214 Conn. 181, 190–92, 571 A.2d 89 (1990); *Maciejewski* v. *West Hartford*, 194 Conn. 139, 142, 480 A.2d 519 (1984); the *liability* for payment of those benefits is not. *Plainville* v. *Travelers Indemnity Co.*, supra, 672.

In *Plainville*, this court concluded that "§ 7-433c is neither a 'work[ers'] compensation law' nor 'occupational disease law' within the meaning of the policy provisions of the insurance contract" at issue in that case.[11] Id., 674. Specifically, the court noted that the employer's liability to pay benefits under § 7-433c "arose *solely* under § 7-433c and not under the provisions of the [Workers' Compensation Act], the proce-

---

[11] "Although [*Plainville*] involved [the] construction of a contract, it analyzed § 7-433c as a matter of statutory interpretation and, therefore, its holding is appropriately applied in the present case." *Carriero* v. *Naugatuck*, supra, 243 Conn. 755 n.6.

dures of which are used in the adjudication of § 7-433c claims." (Emphasis added.) Id., 672. The court therefore stated: "In the absence of a requirement that a heart ailment must be causally connected to the claimant's employment . . . we cannot conclude that benefits paid by an employer under . . . § 7-433c are benefits required by a work[ers'] compensation law or occupational disease law of this state. . . . To do so would require us to ignore the plain effect of this legislation and to contradict our own characterization of this legislation as providing special compensation, or even an outright bonus, to qualifying [police officers] and fire[-fighters]." (Citation omitted; internal quotation marks omitted.) Id., 673–74.

In *Bakelaar* v. *West Haven*, 193 Conn. 59, 66–67, 475 A.2d 283 (1984), this court concluded that "a claimant, qualified for compensation, may elect recovery under *either* § 7-433c or chapter 568 . . . when the injury arose out of or in the course of employment." (Emphasis added.) Specifically, the court stated: "Section 7-433c, while similar to the workers' compensation statutes, is a *separate and distinct* legislation." (Emphasis added.) Id., 67.

The Appellate Court, in *McNulty* v. *Stamford*, supra, 37 Conn. App. 844–45, drawing upon our decisions in *Plainville* and *Bakelaar*, concluded that, under an earlier revision of § 31-306, the fund was *not* required to reimburse a municipal employer for COLAs paid in connection with § 7-433c benefits. In so concluding, the court noted that § 7-433c contains no mention of the fund, and expressly provides that the *employer* is responsible for the payment of benefits. Id., 841–42. Therefore, because neither the Workers' Compensation Act nor any other statute expressly authorized fund liability for § 7-433c benefits, the court ordered that the fund be relieved of any liability. Id., 845.

Significantly, *Plainville, Bakelaar* and *McNulty* were all decided before 1997, when the legislature amended § 31-306 (a) (2) (A) to restore COLAs and provide for reimbursement from the fund. See Public Act 97-205, § 3. Nevertheless, the legislative history of that amendment contains no reference to those cases, or to the underlying statutory provision, § 7-433c. "While we are aware that legislative inaction [as it relates to § 7-433c] is not necessarily legislative affirmation . . . we also presume that the legislature is aware of [this court's] interpretation of a statute, and that its subsequent non-action may be understood as a validation of that interpretation." (Internal quotation marks omitted.) *Nizzardo* v. *State Traffic Commission*, 259 Conn. 131, 154, 788 A.2d 1158 (2002). Therefore, the omission of any legislative discussion concerning the impact of these cases supports the conclusion that the legislature, in amending § 31-306 (a) (2) (A), was concerned primarily with workers' compensation benefits, and not with benefits under § 7-433c.[12]

---

[12] The city's reliance in its brief on *Felia* v. *Westport*, supra, 214 Conn. 181, and *Collins* v. *West Haven*, supra, 210 Conn. 423, for its claim that it is entitled to reimbursement from the fund is misplaced. In *Felia*, this court concluded that the language "compensation in the same amount and the same manner" in § 7-433c means that a claimant under that section is entitled to benefits that are identical to those that would be awarded under chapter 568. *Felia* v. *Westport*, supra, 185. In the present case, by contrast, we are not concerned with the plaintiff *claimant's* entitlement to a benefit, but rather, with whether a *third party*—the fund—is liable to pay for that benefit, as opposed to the municipal employer. Put another way, "the issue here is not whether [the plaintiff] is entitled to [§ 31-306 (a) (2) (A)] benefits, but rather, whether the fund, and not [the city], must pay for those benefits . . . . Thus, instead of interpreting 'compensation' broadly to comport with the remedial purpose of a statute such as § 7-433c, we must construe it narrowly to implement the limited purposes for which the legislature created the fund . . . ." *Civardi* v. *Norwich*, supra, 231 Conn. 300. Similarly, in *Collins*, this court concluded that an employee's notice of a claim under § 7-433c was sufficient because it satisfied the *procedural* notice requirements of chapter 568. *Collins* v. *West Haven*, supra, 430–32. Because the present case concerns the *substantive* liabilities of the city and the fund, and not the procedural avenue of chapter 568, *Collins* is not relevant to our inquiry.

This conclusion is bolstered by remarks made in both the Senate and the House of Representatives concerning how municipal employers would be impacted fiscally by the amendment to § 31-306 (a) (2) (A). Specifically, the history reveals the legislative intent that the fiscal impact on municipalities be limited to the extent that the "municipalities as employers pay *assessments* to the . . . [f]und, either directly as a self-insurer, or through their insurance carrier. Therefore, there will be an increase in the . . . [f]und costs to municipalities . . . ." (Emphasis added.) 40 S. Proc., Pt. 8, 1997 Sess., p. 2832, remarks of Senator Prague; see 40 H.R. Proc., supra, p. 5181, remarks of Representative Donovan ("in as much as a municipality pays an assessment to the [fund], there would be [a municipal impact]"). Put another way, it is apparent that the legislature intended for the fund to reimburse municipal employers for COLAs paid in connection with workers' compensation benefits, and that the municipalities thereafter would pay assessments to the fund according to their liability for COLAs in the previous year. See General Statutes § 31-354 (a) ("There shall be a fund to be known as the Second Injury Fund. Each employer . . . shall . . . pay to the State Treasurer for the use of the state a sum in payment of his liability under [chapter 568] which shall be the special assessment premium surcharge . . . ."); see also General Statutes § 31-349g (assessments for liabilities of fund "shall be allocated between self-insured employers and insured employers based on paid losses for the preceding calendar year").

At oral argument in the present case, however, the city conceded that § 7-433c benefits generally are not included in the calculation of assessments to the fund under the Workers' Compensation Act. Therefore, the remarks of Senator Prague and Representative Donovan, that the amendment to § 31-306 (a) (2) (A) would

impact municipal employers to the extent that they pay assessments to the fund, provide further indication that the legislature was concerned with workers' compensation benefits, and not benefits under § 7-433c. Indeed, were we to imply liability to the fund in the present case, it would create the anomalous result of allowing municipal employers to obtain the benefit of fund reimbursement without incurring the statutory liability of "the special assessment premium surcharge . . . ." General Statutes § 31-354 (a). In accordance with our well settled principles of statutory construction, we cannot conclude that the legislature intended such a result. See *Hartford Courant Co.* v. *Freedom of Information Commission*, 261 Conn. 86, 101, 801 A.2d 759 (2002) (noting "well established canon of statutory construction that those who promulgate statutes or rules do not intend to promulgate statutes or rules that lead to absurd consequences or bizarre results" [internal quotation marks omitted]).

In sum, although we recognize that the legislature may well have been concerned with the fiscal impact on municipalities of retroactive payment of COLAs, and therefore expressly authorized reimbursement from the fund for that purpose with regard to workers' compensation benefits, we cannot extend that limited expression of statutory authority to imply that the fund also is liable to reimburse municipal employers for COLAs paid in connection with the separate and distinct legislation of § 7-433c. As evidenced by the legislature's usage of express statutory authority of fund reimbursement in § 31-306 (a) (2) (A), as well as in other statutes, the legislature certainly knew how to authorize payment from the fund had it intended to do so. See General Statutes § 31-354 (expressly authorizing payment from fund under § 31-306 and General Statutes §§ 31-307b,

31-307c, 31-349 and 31-355).[13] Accordingly, we conclude that the fund is not required to reimburse a municipal employer, like the city in the present case, for COLAs paid in connection with a claim under § 7-433c.[14]

[13] General Statutes § 31-354 (a) provides in relevant part: "The fund shall be used to provide the benefits set forth in section 31-306 for adjustments in the compensation rate and payment of certain death benefits . . . or any other compensation payable from the fund as may be required by any provision contained in this chapter *or any other statute* . . . ." (Emphasis added.)

In its amicus brief, the city of Bridgeport contends that the "other statutes" referred to in § 31-354 (a) encompasses § 7-433c and, therefore, specifically authorizes fund reimbursement in the present case. We disagree. As we have stated previously, § 7-433c is a separate and distinct legislation that does not require any determination that an employee's condition either resulted from his occupation or occurred in the line and scope of employment. In addition, § 7-433c benefits generally are not included in the calculation of assessments to the fund under § 31-354. Therefore, § 7-433c does not require fund reimbursement because the benefits available under that statute are not workers' compensation benefits under chapter 568.

By contrast, the legislature has enacted other statutes that expressly bring heart and hypertension claims within chapter 568. For example, General Statutes § 7-314a (d), which provides for heart and hypertension benefits for volunteer firefighters, provides in relevant part: "For the purpose of adjudication of claims for the payment of *benefits under the provisions of chapter 568*, any condition of impairment of health . . . caused by hypertension or heart disease . . . shall be presumed to have been suffered in the line of duty and within the scope of his employment . . . ." (Emphasis added.) Also, General Statutes § 5-145a, which provides similar benefits for certain state employees, provides in relevant part: "Any condition of impairment of health by hypertension or heart disease . . . shall be presumed to have been suffered in the performance of [the state employee's] duty and shall be *compensable in accordance with the provisions of chapter 568* . . . ." (Emphasis added.) The heart and hypertension benefits provided by § 7-433c, however, have not been brought within chapter 568. Rather, § 7-433c expressly provides that those benefits shall be "in the same amount and the same manner" and "in lieu of" benefits under chapter 568. See *McNulty* v. *Stamford*, supra, 37 Conn. App. 843 ("[u]nlike those [other] statutes, which expressly bring certain heart and hypertension cases within chapter 568, § 7-433c does not"). Accordingly, the benefits provided by § 7-433c are not "any other compensation payable from the fund as may be required by any provision contained in this chapter or *any other statute* . . . ." (Emphasis added.) General Statutes § 31-354 (a).

[14] Because we conclude that the fund is not required to reimburse the city, we do not reach the city's claim that the fund is liable to reimburse it

## II

Having concluded that the city is not entitled by statute to reimbursement from the fund, we turn to the city's claim that §§ 7-433c and 31-306 (a) (2) (A) are unconstitutional under both the federal and state constitutions because they deprive the city of a property interest without providing due process of law. We disagree.

As a threshold matter, we first must determine whether the city has standing constitutionally to challenge state legislation. "The issue of standing arises out of the perceived inconsistency of allowing a municipality, which is a creation of state legislation, to challenge the constitutionality of other acts of legislation by its creator. *Connecticut Light & Power Co.* v. *Norwalk*, 179 Conn. 111, 114, 425 A.2d 576 (1979). This court previously has held as a general rule that [t]owns . . . are creatures of the state, and though they may question the interpretation, they cannot challenge the legality, of legislation enacted by their creator. . . . *Berlin* v. *Santaguida*, 181 Conn. 421, 424, 435 A.2d 980 (1980). However, [a]n exception to this rule has been carved out to allow a municipality, adversely affected by a statute, which is properly in court on a nonconstitutional question to challenge the constitutionality of that statute." (Internal quotation marks omitted.) *Donahue* v. *Southington*, 259 Conn. 783, 792, 792 A.2d 76 (2002). In the present case, the city is litigating a nonconstitutional issue, namely, the proper construction of §§ 7-433c and 31-306 (a) (2) (A), and is affected adversely by our construction of those statutes. As this court previously has stated, "a municipality that is in court on nonconstitutional questions, as to which this question of standing is not a barrier, often has a legitimate stake in full exploration of the constitutionality of con-

for COLAs paid *after* October 1, 1997, in addition to those paid in the period from July 1, 1993 through October 1, 1997.

tested legislation." (Internal quotation marks omitted.) Id., 793. Accordingly, the city has standing to challenge the constitutionality of §§ 7-433c and 31-306 (a) (2) (A).

The city claims that §§ 7-433c and 31-306 (a) (2) (A) are unconstitutional because a retroactive application of those statutes would deprive municipal employers of a protected property interest without due process of law, in violation of the fourteenth amendment to the federal constitution and article first, § 10, of the state constitution.[15] "Although the mere fact that a statute is retrospective does not itself render it invalid; *Schieffelin & Co.* v. *Dept. of Liquor Control*, [194 Conn. 165, 174, 479 A.2d 1191 (1984)]; [r]etroactive legislation presents problems of unfairness that are more serious than those posed by prospective legislation, because it can deprive citizens of legitimate expectations and upset settled transactions. For this reason, [t]he retroactive aspects of [economic] legislation, as well as the prospective aspects, must meet the test of due process: a legitimate legislative purpose furthered by rational means. . . . *General Motors Corp.* v. *Romein*, [503 U.S. 181, 191, 112 S. Ct. 1105, 117 L. Ed. 2d 328 (1992)]."[16]

---

[15] The due process clause of the fourteenth amendment to the United States constitution provides in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law . . . ."

Article first, § 10, of the constitution of Connecticut provides: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."

The city claims that the due process provisions of the federal and state constitutions "generally have the same meaning and pose similar constitutional limitations." Because the city has failed to conduct an independent analysis of its claim under the state constitution, we resolve this issue under the federal constitution.

[16] The city "[does] not belong to a constitutionally recognized suspect class and [it has] not alleged the impairment of a fundamental constitutional right. [The city's] claim must be tested therefore, in accordance with the rules that normally govern constitutional challenges of economic or social welfare legislation, by ascertaining whether the legislature has acted arbi-

(Internal quotation marks omitted.) *Serrano* v. *Aetna Ins. Co.*, 233 Conn. 437, 457, 664 A.2d 279 (1995); see *Bhinder* v. *Sun Co.*, 263 Conn. 358, 374, 819 A.2d 822 (2003) ("retroactive legislation only must meet the most deferential standard of review, namely, the rational basis test").[17]

Even if we were to assume, arguendo, that the city was deprived of a protected property interest, we nevertheless conclude that §§ 7-433c and 31-306 (a) (2) constitute rational means to further a legitimate legislative purpose and, accordingly, satisfy the requirements of due process. We previously have concluded that § 7-433c "is justified in the interest of promoting public safety, and does not deprive a town of property without due process of law." *Grover* v. *Manchester*, 168 Conn. 84, 88, 357 A.2d 922, appeal dismissed, 423 U.S. 805, 96 S. Ct. 14, 46 L. Ed. 2d 26 (1975). Specifically, we have concluded that § 7-433c is a rational means to further the legitimate legislative purpose of "encourag[ing] qualified individuals to seek employment as fire[fighters] and [police officers]." Id. Similarly, § 31-306 (a) (2) (A) serves a legitimate legislative purpose, namely, to restore the annual COLAs applied to the benefits received by widows, widowers, surviving children and

trarily or irrationally." (Internal quotation marks omitted.) *Serrano* v. *Aetna Ins. Co.*, 233 Conn. 437, 457, 664 A.2d 279 (1995).

[17] The city proposes that we resolve this claim under the three-pronged test set forth by the United States Supreme Court in *Mathews* v. *Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), for issues of procedural due process. See *Harkless* v. *Rowe*, 232 Conn. 599, 625, 657 A.2d 562 (1995). In the present case, however, the city claims that it has, or will be, denied due process by the enactment of retroactive legislation. Such claims traditionally have been analyzed under *substantive* due process principles. See *Usery* v. *Turner Elkhorn Mining Co.*, 428 U.S. 1, 16, 96 S. Ct. 2882, 49 L. Ed. 2d 752 (1976); see also 2 R. Rotunda & J. Nowak, Treatise on Constitutional Law, Substance and Procedure (3d Ed. 1999) § 15.9, pp. 658–75. Accordingly, application of the *Mathews* test would be inappropriate in the present case.

totally disabled workers.[18] See 40 S. Proc., supra, p. 2823, remarks of Senator Prague. Moreover, requiring that the municipal employer or its insurer pay for these COLAs is a rational means to further that legitimate legislative purpose, because the § 7-433c benefits are provided, in the first place, by municipalities or their insurers. Accordingly, we conclude that §§ 7-433c and 31-306 (a) (2) (A) satisfy the constitutional requirements of due process.

The decision of the board is affirmed.

In this opinion the other justices concurred.

---

[18] In the Senate debate concerning the 1997 amendment to § 31-306 (a) (2) (A), Senator Prague remarked: "[A]s so often happens up here, there are errors made. This bill rectifies one of those errors that was made in 1993, when the Workers Compensation bill was passed. That bill at that time changed the system. Somehow or other people like widows, widowers, surviving children, and totally disabled workers, were inadvertently eliminated from a COLA. What this bill does is restore the COLAs to those people who fall in those categories. At the public hearing we held, even the business industry acknowledged the fact that this was not their intention. That these people need to get [COLAs], and this bill does that. In addition, this bill will pay retroactively, the COLA amounts that these people were denied from 1993 to 1997. And from 1997 on, anybody who falls within these categories will get their [COLAs]." 40 S. Proc., supra, p. 2823.